# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE ISBELL, JR., and G&B EMPORIA, Inc., <br><br>                    Plaintiffs, <br><br>      vs. <br><br> CITY OF SAN DIEGO, <br><br>                    Defendant. | CASE NO. 98CV0688 IEG (CAB) <br><br> **MEMORANDUM DECISION AND ORDER** |

The above-entitled matter came before the Court for trial without a jury on August 1, 2, 3, 4, 8, 9, 10, and 22, 2006. Roger Jon Diamond, Esq., and John B. Barriage, Esq., appeared on behalf of George Isbell, Jr., and G&B Emporia, Inc., ("plaintiffs"). Robert J. Walters, Esq., Deputy City Attorney for the City of San Diego, appeared on behalf of defendant the City of San Diego ("defendant").[1]

This memorandum decision constitutes the Court's findings of fact and conclusions of law.

In the pretrial order, which this Court signed on November 7, 2005, the parties admitted to certain facts requiring no proof at trial, as set forth in Section III of the pretrial order. The Court incorporates by reference the facts admitted by the parties and set forth in the pretrial order. The Court's findings of fact are based upon those facts admitted in the pretrial order and the testimony and

---

[1] Mr. Walters is the third city attorney assigned to this case. (Doc. Nos. 21 and 178.) Mr. Walters was assigned to this matter in the Spring of 2006, only a few months before trial.

evidence presented at trial.[2]

Federal jurisdiction is based on 28 U.S.C. sections 1331, 1343, 2201, 2202 and 42 U.S.C. section 1983. No dispute exists as to venue in the Southern District of California.

On April 10, 1998 plaintiffs filed a complaint seeking equitable and legal relief. Plaintiffs asked the Court to enjoin defendant from arresting or citing plaintiffs for violating city ordinances; damages; a declaratory judgment stating that plaintiffs have the right to operate their adult store without regard to the municipal code; and any relief the Court deemed appropriate. On August 14, 1998 defendant filed an answer.

In their complaint plaintiffs challenge the constitutionality of San Diego Municipal Code section 101.1810, adopted in 1979, which states:

> No person shall cause or permit the establishment, enlargement or transfer of ownership or control of any adult establishment if such establishment is within 1000 feet of another such business, <u>1000 feet of any residential zone</u>, or within 1000 feet of any church, school, public park or social welfare institution within the City of San Diego. (emphasis added.)

Section 101.1810 is a dispersal ordinance designed to "to make some areas available for adult [uses] and their patrons, while at the same time preserving the quality of life in the community at large by preventing those [uses] from locating in other areas." <u>City of Renton v. Playtime Theaters</u>, 475 U.S. 41, 55 (1986).

Under the current code, adopted in 1997 and effective as of 2000, the City of San Diego disperses adult business pursuant to municipal code section 141.0601(b). Section 141.0601(b) states:

> Adult entertainment businesses shall not be established, enlarged, or undergo a transfer of ownership or control if the *structure* housing the business would be located within 1000 feet of any of the following: (A) another *structure* housing an adult entertainment business; (B) <u>*the property line of a residentially zoned property;*</u> or (C) the property line of a church except those established in accordance with section 141.040(a), *a school, a public park,* or a *social service institution*. (emphasis added as to the underlined portion.)

Dispersal ordinances which attempt to control the secondary effects of adult establishments are constitutional if they are "designed to serve a substantial governmental interest and allow for

---

[2] Pursuant to Fed. R. Evid. 201 the Court takes judicial notice of the parties' documents previously filed and maintained on the court's docket.

reasonable alternative avenues of communication."[3] Renton, 475 U.S. at 50. To determine whether an ordinance allows for alternative avenues of communication, a court must analyze the effect of the ordinance under the actual conditions prevailing in the city. Isbell, 258 F.3d at 1112 (citing Renton, 475 U.S. at 53). The City bears the burden of persuasion; it must demonstrate that its ordinance provides reasonable alternative means of communication. Id. (citing Lim v. City of Long Beach, 217 F.3d 1050, 1054 (9th Cir. 2000)).

Determining whether there are reasonable alternative means of communication requires a two step inquiry. Diamond v. City of Taft, 215 F.3d 1052, 1055 (9th Cir. 2000) ("We employ a two-step test to determine whether a city provides a sufficient number of alternative avenues of communication: (1) the relocation sites provided to adult businesses must be considered part of an actual business real estate market for commercial enterprises generally; and (2) after excluding those sites that may not be properly considered part of the relevant real estate market, [whether] there are an adequate number of alternative relocation sites").

**1.     Available Sites**

To evaluate whether constitutionally sufficient alternatives exist, a court must determine the number of available, alternative sites. Isbell, 258 F.3d at 1112 (citing Walnut Properties, Inc. v. City of Whittier, 861 F.2d 1102, 1108 (9th Cir. 1988)). When analyzing the ability of adult businesses to locate, all adult businesses should be considered collectively. Thus, a court should consider the number of sites available to all adult businesses simultaneously when the separation requirement between adult businesses is taken into account. Id. at 1114 (citing Walnut Properties, 861 F.2d at 1108).

For a court to consider a site available, it must be in the "actual business real estate market." Id. at 1112-1113 (citing Lim, 217 F.3d at 1055). A court need not consider whether a site will result in "lost profits, higher overhead costs, or even prove to be commercially infeasible for an adult business;" the relevant issue is whether a site is part of a market for commercial enterprises. Id. at 1113 (citing Topanga Press, Inc. v. City of Los Angeles, 989 F.2d 1524, 1531 (9th Cir. 1993)). In Lim,

---

[3] Following the Ninth Circuit's decision in Isbell v. City of San Diego, 258 F.3d 1108, 1112 (9th Cir. 2001), the only remaining issue in this case is whether the adult use ordinance provides for reasonable alternative avenues of communication in the city of San Diego.

1  the court set forth the relevant considerations in determining whether a site is reasonably within the
2  business real estate market:

> (1) a relocation site is not part of the market if it is 'unreasonable to believe that it would ever become available to any commercial enterprise;' (2) a relocation site in a manufacturing or industrial zone that is 'reasonably accessible to the general public' may also be part of the market; (3) a site in a manufacturing zone that has proper infrastructure may be included in the market; (4) a site must be reasonable for some generic commercial enterprise, although not every particular enterprise, before it can considered part of the market; and (5) a site that is commercially zoned is part of the relevant market ... In addition, a site must obviously satisfy the conditions of the zoning ordinance in question. Lim, 217 F.3d at 1055 (quoting Topanga Press, 989 F.2d at 1531).

8  If the City provides a good faith and reasonable list of potentially available properties, the
9  burden shifts to plaintiff to show that certain sites are not available or would not reasonably become
10 available. Isbell, 258 F.3d at 1113 n.5; Lim, 217 F.3d at 1055 ("A city cannot merely point to a
11 random assortment of properties and simply assert that they are reasonably available to adult
12 businesses. The city's duty to demonstrate the availability of properties is defined, at a bare minimum,
13 by reasonableness and good faith").

14 Defendant has not provided a good faith and reasonable list of potentially available properties.
15 Isbell, 258 F.3d at 1113 n.5. Even though at trial, defendant presented a detailed study of sites
16 available under the current adult business ordinance.[4] (Defendant's Exhibits A and B, Original Report

---

[4] Mr. Zola, a Program Manager at HDR Engineering and defendant's expert with 32 years of planning experience, provided a report which set forth his opinion about the number of available sites and concurrently available sites pursuant to the 2000 ordinance. According to Mr. Zola's January 2005 report, there are 1570 available sites and 72 simultaneously available new sites. (Exhibit A, Original Report of Lloyd Zola.) Mr. Zola determined the number of available sites after discarding sites that did not satisfy the distance requirements in San Diego Municipal Code section 141.0601(b), or the Topanga Press criteria. Mr. Zola also conducted a second study in response to plaintiffs' expert report. Mr. Zola's August 2005 Revised Report found 1297 available sites and 65 simultaneously available sites. (Exhibit B, Revised Report of Lloyd Zola.) Mr. Zola again based his findings on sites which met the ordinance's distance requirements and the Topanga Press factors. Mr. Zola's final conclusion is that there are 1114 available sites and 45-46 simultaneously available sites. (Exhibit OOO, Table E - Simultaneously Available Sites.)

Plaintiffs' expert Mr. Pleasant, a planning consultant with more than 22 years of experience, conducted a review of available sites in response to defendant's report. Mr. Pleasant's May 2005 study lists 61 actually available sites and 44 simultaneously available sites. (Exhibit 1, Report from Steve Pleasant.) Mr. Pleasant determined the number of actually available sites based on his understanding of San Diego Municipal Code section 141.0601(b), the Topanga Press criteria, and his own "14 Considerations of Site Availability." Mr. Pleasant's fourteen factors include: (1) site is occupied and not available; (2) building or unit is too large; (3) building or unit is too small; (4) lot is too large; (5) lot is too small; (6) parking is inadequate; (7) sensitive use or zone too close; (8) non retail commercial potential; (9) lack of sidewalks, lights, and /or other infrastructure; (10) lacks reasonable public access; (11) in future SR 905 take area; (12) designated open space; (13) multi

of Lloyd Zola and Revised Report of Lloyd Zola.) However, defendant neglected to present evidence of sites available in the city under the former adult business ordinance, the ordinance plaintiffs challenge. Defendant claims that "there is little if any substantive difference between either ordinance" and that "it is completely illogical to consider the regulatory framework as [it is] one that no longer is in effect and cannot impose any obligations on the adult business in the present sense." (Defendant's Supplemental Briefing Regarding Applicable Ordinance at 3-4.)

Defendant's argument fails for three reasons. First, from the text of the two ordinances it is clear that as applied to the city each ordinance permits a different number of adult entertainment uses. The former ordinance prohibited adult uses "if such establishment is within 1000 feet of ... any residential zone." (San Diego Municipal Code section 101.1810, 1979.) Residential zones were defined in the old municipal code and included areas of San Diego zoned R-1, R-2, R-2A, R-3, R-4, R-V.[5] (San Diego Municipal Code section 101.1801.23, 1979.) The new ordinance, and the ordinance that defendant studied, prohibits adult uses "within 1000 feet of ... the *property line* of a residentially zoned property." (San Diego Municipal Code section 141.0601(b), 2000.) (emphasis in original.) Property line means a "line that defines the boundaries of a lot or premises for purposes of applying development regulations." (San Diego Municipal Code section 113.0103, 2000.) Residential zones are not defined in the 2000 code.[6]

During trial plaintiffs introduced evidence of the difference in application of the two ordinances. Plaintiffs' business, the Adult Emporium, is 650 feet away from a residential zone, but

---

species habitat area; and (14) residential condominiums. Subsequently, Mr. Pleasant reviewed his findings, Mr. Zola's findings, and created two addendum reports. Mr. Pleasant's January 2006 addendum report found 35 actually available sites and 11 simultaneously available sites. (Exhibit 759, January 2, 2006 Addendum Report.) The April 2006 addendum shows 959 available sites, 25 actually available sites and 11 simultaneously available sites. (Exhibit 760, April 25, 2006 Addendum Report.) Mr. Pleasant relied on the same methodology in his original report and addenda.

[5] At trial Mr. Robert Dideon, a Project Officer in the city's Development Services Division, testified that the "residential zone" definition is really a non inclusive list of residential zones that triggered the 1000 foot separation requirement.

[6] Mr. Dideon also testified that San Diego Municipal Code section 131.0401 defines a "residential zone" for the current municipal code. However, section 131.0401 sets forth the purpose of a residential zone rather than a definition. Furthermore, the Court notes that "residential zone" is not italicized in the code and is therefore not a defined term.

900 feet away from a residential property line.[7] Thus, the new ordinance, and its focus on a property line as compared to a residential zone, is a less restrictive measurement. Defendant's study of the new and less restrictive ordinance offers no insight into how many sites were available under the older more limited terms. Defendant's study also lacks any comparisons of residential zones to property lines to prove its assertion that the ordinances are substantively similar.[8]

Moreover, defendant has been on notice that the old ordinance was the ordinance at issue in this case at least since the Court denied defendant's motion for summary judgment on April 28, 2003.[9] In support of defendant's motion for summary judgment defendant submitted a declaration by Development Services Deputy Director Terry Marshall in which Mr. Marshall analyzed the new ordinance to determine whether it provided reasonable avenues of communication for adult uses. (Marshall Decla. ISO Motion for Summary Judgment ¶ 8., Doc. No. 125.) However, the Court considered the old ordinance in its order denying summary judgment, despite defendant's assertion that the regulations had not substantively changed. (Memo. ISO Motion for Summary Judgment at 2 n. 1, Doc. No. 124.)

Second, according to Mr. Dideon, the distance requirements set forth in the two ordinances are enforced differently. For example, under the old ordinance the city measured the distance between an adult entertainment use and a sensitive use from the wall of the suite or unit of the adult use. Today, the city measures the separation requirement from the perimeter of the building in which the

---

[7] Notably, while defendant's witness Mr. Dideon testified that the two ordinances consider residential properties the same, defendant never challenged plaintiffs' evidence that the two ordinances actually produce different results. Mr. Dideon's claim that the two ordinances mean the same thing is further undermined by the text of the ordinances themselves.

[8] Defendant's arguments that plaintiffs should have raised the issue of which ordinance applied at an earlier date, or that because plaintiffs' expert also analyzed the new ordinance the Court should consider the new ordinance, lack merit. First, plaintiffs were not required to inform defendant that it was inexplicably proceeding under the incorrect code provision. The burden is on the defendant city to provide a good faith and reasonable list of properties available under the applicable ordinance. Isbell, 258 F.3d at 1113 n.5. Second, plaintiffs' expert studied the new ordinance in response to defendant's expert report. Therefore, plaintiffs did not waive their right to proceed under the 1979 ordinance.
Finally, and perhaps most importantly, the Court notes that plaintiffs never amended their complaint nor has defendant produced any evidence that plaintiffs agreed to consider the new ordinance.

[9] The Ninth Circuit also relied upon the old ordinance in its July 21, 2001 order.

adult use is located, rather than the internal suite. The practical effect of the change according to defendant's witness is that the current 1000 foot separation requirement reduces the number of potentially available sites. Accordingly, the former code could have provided for a greater number of available sites. That the old ordinance may have created a more favorable measurement system for adult uses is immaterial. It is significant, however, that defendant's expert recognized and identified differences in the application and construction of the two particular ordinances.

Finally, despite defendant's assertions to the contrary, the constitutionality of the old ordinance effects plaintiffs position relative to the new ordinance. At trial the parties stipulated that 16 adult entertainment businesses in existence prior to the enactment of the 1979 ordinance are nonconforming legal uses because they predate the ordinance. (Exhibit SSS.) Those businesses, according to defendant, are not bound by city dispersal ordinances enacted after the businesses opened.[10] Defendant recognizes previously conforming uses or nonconforming uses and permits their ongoing operation subject to amortization periods set forth in the municipal code.[11] (San Diego Municipal Code § 127.0101-121.0102, 2000)

Plaintiffs' lawsuit challenges the 1979 ordinance, the governing adult use regulation in effect at the time plaintiff Isbell purchased the site for the Adult Emporium and later started to operate an adult bookstore. Therefore, the constitutionality of this ordinance determines whether plaintiffs' store is a previously conforming use, like the 16 other nonconforming legal adult stores, exempt from the later enacted 2000 ordinance; or, a nonconforming use subject to the distance restraints of both ordinances and therefore subject to closure or relocation.

Defendant's failure to provide any evidence as to the number of sites available pursuant to the 1979 ordinance prevents the Court from determining whether the 1979 ordinance provides reasonable avenues of communication for adult uses. Accordingly, defendant has failed to meet its burden of

---

[10] The existing businesses are effectively "grandfathered" in to the city's plan. A grandfather clause is "a clause exempting a class of persons (as from a regulatory law) because of circumstances applying before the clause takes effect." Webster's Third New International Dictionary 987 (3rd ed. 1986).

[11] The amortization period for adult uses, when ownership changes hands, is five years so long as the change in ownership occurs within two years of when the use became non conforming. (San Diego Municipal Code § 141.0601(b)(2), 2000.) Previously conforming uses may operate indefinitely if the owner remains the same.

providing information as to available relocation sites, and demonstrating that the ordinance provides reasonable alternative means of communication. Isbell, 258 F.3d at 1112. (citing Lim, 217 F.3d at 1054. Nevertheless, the Court will evaluate defendant's evidence regarding the sufficiency of sites.

**2.    Sufficiency of Sites**

When evaluating whether the number of available sites is constitutionally sufficient, a court should consider the total demand for the establishment of adult entertainment. Isbell, 258 F.3d at 1114 (citing Young v. City of Simi Valley, 216 F.3d 807, 822 (9th Cir. 2000)). In the 2001 Isbell decision the Ninth Circuit specifically faulted defendant for neglecting to offer evidence of total demand. Isbell, 258 F.3d at 1114. The Ninth Circuit remanded the case to this Court so that defendant could present evidence of, among other things, demand for adult entertainment in the City of San Diego. Id. 1114-1115. In doing so the Ninth Circuit put defendant on notice that evidence of supply and demand was necessary to demonstrate a constitutionally sufficient number of sites, and that defendant should also produce evidence of "other factors including, but not limited to, the percentage of available acreage theoretically available to adult businesses, the number of sites potentially available in relation to the population, 'community needs, the incidence of [adult businesses] in other comparable communities, [and] the goals of the city plan.'" Id. at 1114 (quoting Young, 216 F.3d at 822; quoting Int'l Food & Beverage Sys. v. City of Fort Lauderdale, 794 F.2d 1520, 1526 (11th Cir. 1986)).

In 2003, in its order denying summary judgment for defendant, this Court stated:

> The Court finds, however, that it need not determine whether the number of sites available is two, as plaintiffs contend, or twenty-five (or twelve or thirteen assuming all of the sites are filled with adult businesses) as defendant asserts, to rule on this motion for summary judgment because the Court concludes that the defendant has failed to establish the sufficiency of the sites it claims are available. The Court, accordingly, must deny defendant's motion for summary judgment, as discussed below.

This Court held that a showing of the number of parties who had applied for a zoning use certificate ("ZUC") was insufficient to demonstrate demand for adult business locations.[12] This Court futher criticized defendant for failing to offer evidence of other types of inquires about adult business

---

[12] At trial Mr. Dideon testified that a ZUC is part of the business licensing process for adult businesses at which time the city's department of Development Services determines whether the proposed site is appropriately zoned for an adult business. Currently, the application fee for approval of an adult store is $2300.

locations. The Court also noted that:

> Contrary to the instruction of the Ninth Circuit, the City has not considered any of the [Young] factors. The Court, moreover, is not persuaded by the arguments made by defendant at the hearing that it need not look to the Young factors either because the supply exceeds demand in this case or because it is too difficult to conduct a Young analysis.

Thus, by virtue of both the published 2001 Ninth Circuit decision in this case and, this Court's 2003 order denying summary judgment, defendant was well aware of both its duty to present evidence of demand for adult entertainment and the expected nature of the evidence.

Defendant's evidence of demand consisted of: (1) 3 applications for ZUCs since 2000; (2) studies indicating that 8.03% of the total acreage in San Diego is available for adult uses;[13] (3) copies of the relevant code provisions showing that both the former and current adult use ordinances permit the establishment of adult businesses in commercial and industrial zones while also prohibiting specific adult uses in certain zones; (4) testimony that one of the goals of the city's general plan is to create a city congenial to healthy human development; and (5) past, current, and future population estimates for the city of San Diego produced by the San Diego Association of Governments. Plaintiffs' expert, Mr. Pleasant, also testified on cross examination about demand. Mr. Pleasant testified that according to his analysis there are 24 simultaneously available new sites in the city per the 2000 ordinance, which based on the city's population from 2000-2005, meant one new store for every 52,000 people.[14] Mr. Pleasant concluded that 1 store per 52,000 people was insufficient for demand but conceded that he is not an expert in the study of demand in the adult industry.[15]

Defendant did not however, offer evidence of: (1) the number of applications for a $499 single disciplinary review which is an evaluation of a site and the zoning rules that might apply to the

---

[13] Mr. Zola determined the percentage of acres available for adult uses by analyzing information from the city Planning Department. The 8.03% figure represents the acreage constituting the 1114 sites that Mr. Zola identified as available for adult uses. (Defendant's Exhibit QQ.) Plaintiffs dispute the number of available sites and argue that there are actually 959 available sites. (Plaintiffs' Exhibit 760.) Both estimates are based on the new rather than the old ordinance.

[14] Mr. Pleasant actually found 44 simultaneously available sites in his first report but concluded that the 20 existing non conforming adult businesses would occupy 20 of the 44 simultaneously available sites. According to Mr. Pleasant that left "new" adult uses with 24 simultaneously available sites. (Exhibit 1, Report from Steve Pleasant.)

[15] During rebuttal, Mr. Zola criticized Mr. Pleasant's demand estimates and opined that when calculating the number of stores per person, the correct ratio is the number of existing stores plus the number of new stores per the population of the city.

proposed use; (2) the number of people who made free over the counter inquiries about zoning at proposed specific sites for adult uses;[16] (3) the percentage of acreage set aside for adult businesses under the 1979 ordinance; (4) the number of adult businesses and the percentage of acreage set aside for adult businesses in comparable municipalities, without which the Court is deprived of the ability to draw meaningful inferences as to what a constitutionally sufficient number of sites is; or (5) evidence of the city's demand for adult entertainment.

In its opinion, the Ninth Circuit observed that whether sufficient sites are available under a particular ordinance involves an analysis of both total demand in the locale and the Young factors, and stated that "in the present case, such a comprehensive and collective analysis is clearly called for ... it has not been done ... in its absence, we have no way of concluding that reasonable alternative avenues of communication exist in San Diego." Isbell, 258 F.3d at 1115. Assuming *arguendo* that the Ninth Circuit's opinion in this case did not require an expert "comprehensive and collective analysis" on demand, defendant still had the burden of presenting some analysis. An analysis requires more than a claim that the three ZUC applications in the last six years combined with the declining number of adult stores in the city satisfies the city's demand for adult entertainment.[17]

## CONCLUSION

Defendant failed to provide both an accurate list of sites available for an adult use in the city of San Diego and evidence demonstrating that the available sites sufficiently satisfy demand for adult entertainment in San Diego under San Diego Municipal Code section 101.1810, (1979). Therefore, without more, the Court finds that San Diego Municipal Code section, 101.1810 (1979), is unconstitutional for lack of reasonable alternative avenues of communication. The Court declines to rule on the constitutionality of San Diego Municipal Code section 141.0601(b) (2000) because that

---

[16] Given the expense of the ZUC ($2300), as compared to a single disciplinary review ($499) or a free over the counter inquiry, the ZUC statistic alone is not particularly reliable. Furthermore, because this Court specifically recognized the other forms of inquiries in its order denying defendant summary judgment, failing to provide information about the other inquiries is particularly inexcusable. Regardless of whether there was no method in place to track the number of inquires prior to the motion for summary judgment, defendant has been on notice for at least the last two and half years that this Court considered the number of all types of inquiries into adult uses a significant component of the demand analysis. Defendant has created other reports and gathered other forms of data in preparation for this trial; it could have also tracked this indicia of demand.

[17] The Court recognizes defendant's effort to comply with the Young factors by introducing evidence of the city's general plan and how the adult use ordinances fit into the general plan.

1  provision of the municipal code is not properly before the Court.

2  Plaintiffs may continue to operate the Adult Emporium at its current location, approximately
3  900 feet from a residential property line, as a nonconforming legal use.[18]  The Adult Emporium is a
4  legal nonconforming use because its operation predates the 2000 ordinance which prohibits the
5  establishment of adult entertainment businesses from locating within 1000 feet of a residential
6  property line.  The Adult Emporium is the only adult use which may benefit from the Court's decision
7  in this case.  Doran v. Salem Inn, Inc., 422 U.S. 922, 931 (1975) ("Moreover, neither declaratory nor
8  injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with
9  respect to the particular federal plaintiffs, and the State is free to prosecute others who may violate the
10 statute").

11 **IT IS HEREBY ORDERED** that the Court finds in favor of plaintiffs as to their liability
12 claim, and against defendant the City of San Diego.  The parties shall contact the Court **no later than**
13 **seven (7) days after this order is stamped "filed"** to set a briefing schedule for the remaining issues.

15 **IT IS SO ORDERED**

17 **DATED:  September 21, 2006**

19 **IRMA E. GONZALEZ, Chief Judge**
   **United States District Court**

---

28  [18] Plaintiffs right to own and operate the non conforming use are subject San Diego Municipal Code Article 7, Division 1 *et seq*, "General Review Procedures for Previously Conforming Premises and Uses."